Deborah A. Sivas (Calif. Bar No. 135446)
Leah J. Russin (Calif. Bar No. 225336)
Noah Long (Certified Law Student)
ENVIRONMENTAL LAW CLINIC
Mills Legal Clinic at Stanford Law School
559 Nathan Abbott Way
Stanford, California  94305-8610
Telephone:   (650) 725-8571
Facsimile:    (650) 723-4426

Justin Augustine (Calif. Bar No. 235561)
CENTER FOR BIOLOGICAL DIVERSITY
1095 Market Street, Suite 511
San Francisco, CA  94103
Telephone:  (415) 436-9682
Facsimile:   (415) 436-9683

Attorneys for Plaintiff CENTER FOR BIOLOGICAL DIVERSITY

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | | |
|---|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, | ) | Case No. C 07-4997 MHP |
| | ) | |
| Plaintiff, | ) | **PLAINTIFF'S MEMORANDUM** |
| | ) | **OF POINTS AND AUTHORITIES** |
| v. | ) | **IN SUPPORT OF MOTION FOR** |
| | ) | **SUMMARY JUDGMENT** |
| OFFICE OF MANAGEMENT AND BUDGET, | ) | **ON FEE WAIVER ISSUE** |
| | ) | |
| Defendant. | ) | |
| _____ | ) | **Date:**    Feb. 25, 2008 |
| | | **Time:**    2:00 p.m. |
| | | **Court:**   15, 18th Floor |

# TABLE OF CONTENTS

I.      INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.     FACTUAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

        A.    The National Fuel Economy Standards . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

        B.    The Center for Biological Diversity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

        C.    The FOIA Request . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

III.    LEGAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

IV.     STANDARD OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

V.      ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

        A.    The Center Is Entitled to a Full Fee Waiver Because the Requested Documents
              that Are Likely to Contribute Significantly to the Public Understanding
              Government Operations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

              1.    The Center's Request Concerns the Operations of Government . . . . . . . . . . . 10

              2.    The Requested Documents Are Not in the Public Domain . . . . . . . . . . . . . . . 11

              3.    The Requested Documents Will Contribute to the Understanding of OMB's
                    Work for a Reasonably Large Audience . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

              4.    The Center's Request is Likely to "Contribute Significantly" to Public
                    Understanding of OMB's Role in The Rule Making . . . . . . . . . . . . . . . . . . . . 14

        B.    OMB Did Not Rebut the Center's Prima Facie Case for a Fee Waiver . . . . . . . . . . . 16

              1.    The Quantity of Documents to Be Released Has No Bearing on the
                    Question of Fee Waiver . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

              2.    OMB's Assertion that It Would "Decline to Release" Most of the
                    Documents Requested by the Center Is Irrelevant to the Question of Fee
                    Waiver . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

              3.    OMB's Fee Waiver Denial Rests on the Erroneous Contention that Only
                    the Agency Charged with Implementing a Program Must Release
                    Documents to the Public . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

              4.    OMB Erred in its Creation of an Overly Broad "Public Dissemination"
                    Criteria . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

        C.    Strong Policy Consideration Support a Full Fee Waiver in this Case . . . . . . . . . . . . 20

VI.     CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

1

2

# TABLE OF AUTHORITIES

## FEDERAL CASES

3

4
*Campbell v. Department of Justice*, 164 F.3d 20 (D.C. Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . 18

5
*Carney v. United States Department of Justice*, 19 F.3d 807 (2d Cir. 1994) . . . . . . 12, 13, 18, 19

6
*Center for Biological Diversity v. National Highway Traffic Safety Administration*,
    508 F.3d 508 (9th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 4

7

8
*Community Legal Services, Inc. v. HUD*, 405 F. Supp. 2d 553 (E.D. Pa. 2005) . . . . . . . . . . . . 12

9
*D.C. Technical Assistance Organization v. HUD*, 85 F. Supp. 2d 46 (D.D.C. 2000) . . . . . . 12, 15

10
*Department of Air Force v. Rose*, 425 U.S. 352 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

11
*Ettinger v. Federal Bureau of Investigation*, 596 F. Supp. 867 (D. Mass. 1984) . . . . . . . . . . 8, 17

12
*Eudey v. CIA*, 478 F. Supp. 1175 (D.D.C. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 16

13
*Fitzgibbon v. Agency for International Development*, 724 F. Supp.1048 (D.D.C. 1989) . . . . . . 18

14
*Friends of the Coast Fork v. U.S. Department of the Interior*, 110 F.3d 53
    (9th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 10, 17

15

16
*Greeson v. Imperial Irr. District*, 59 F.2d 529 (9th Cir. 1932) . . . . . . . . . . . . . . . . . . . . . . . . . . 3

17
*Interstate Nat. Gas Co. v. Southern California Gas Co.*, 209 F.2d 380 (9th Cir. 1954) . . . . . . . 3

18
*Judicial Watch, Inc. v. Department of Energy*, 310 F. Supp. 2d 271 (D.D.C. 2004) . . . . . . 14, 19

19
*Judicial Watch, Inc. v. Rossotti*, 326 F.3d 1309 (D.C. Cir. 2003) . . . . . . . . . . . . . . . 11, 15, 16, 20

20
*Lee v. City of Los Angeles*, 250 F.3d 668 (9th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

21
*Massachusetts v. EPA*, 127 S. Ct. 1438 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

22
*McClellan Ecological Seepage Situation v. Carlucci*, 835 F.2d 1282 (9th Cir. 1987) . . . . *Passim*

23
*Oregon Natural Desert Association v. U.S. Department of Interior*, 24 F. Supp. 2d 1088
    (D. Or. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

24

25
*Pederson v. Resolution Trust Corp.*, 847 F. Supp. 851 (D. Colo. 1994) . . . . . . . . . . . . . . . . 8, 13

26
*Project on Military Procurement v. Department of Navy*, 710 F. Supp. 362
    (D.D.C. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 16

27

28
*Schrecker v. Department of Justice*, 970 F. Supp. 49 (D.D.C. 1997)     . . . . . . . . . . . . . . 18

*United States Department of Defense v. Federal Labor Relations Authority*,
  510 U.S. 487 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 20

*Vaughn v. Rosen*, 484 F.2d 820 (D.D.C. 1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*VoteHemp, Inc. v. Drug Enforcement Administration*, 237 F. Supp. 2d 55
  (D. D. C. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 14, 15

## FEDERAL STATUTES

Administrative Procedures Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Endangered Species Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Energy Policy and Conservation Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 11, 16

Freedom of Information Act ("FOIA"), 5 U.S.C. § 552 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

National Environmental Policy Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

5 U.S.C. § 552(a)(4)(A)(ii)(I) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

5 U.S.C. § 552(a)(4)(A)(ii)(II) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

5 U.S.C. § 552(a)(4)(A)(ii)(III) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

5 U.S.C. § 552(a)(4)(A)(iii) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 6, 7, 8

5 U.S.C. § 552(a)(4)(A)(vii) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 17

5 U.S.C. §552(a)(4)(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

42 U.S.C. § 32902(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

42 U.S.C. § 32902(f) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

## FEDERAL RULES AND REGULATIONS

5 C.F.R. § 1303.70 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

## CONGRESSIONAL RECORDS AND REPORTS

132 Cong. Rec. S14298 (Sept. 30, 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 16, 18

S. Rep. No. 854, 93d Cong., 2d Sess. 11 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

## MISCELLANEOUS

Department of Justice, *Freedom of Information Act Guide* (March 2007) . . . . . . . . . . . . . . . 18

Office of Management and Budget Website,

http://www.whitehouse.gov/omb/organization/role.html . . . . . . . . . . . . . . . . . . . . . . . . . . .3

Office of Management and Budget, *OMB's Role in Reviews of Agency Draft Rules and the Transparency of Those Reviews* (September 2003),
http://www.gao.gov/new.items/d03929.pdf . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

United States Department of Justice, *New Fee Waiver Policy Guidance,* FOIA Update Vol. VIII, No. 1 (1987),
http://www.usdoj.gov/oip/foia_updates/Vol_VIII_1/viii1page2.htm . . . . . . . . . . . 11, 12, 15

1

**NOTICE OF MOTION**

2

TO DEFENDANT AND ITS COUNSEL OF RECORD:

3

PLEASE TAKE NOTE that, pursuant to Federal Rule of Civil Procedure 56, Plaintiff

4

Center for Biological Diversity ("Center), by and through its undersigned counsel of record,

5

6

hereby moves for summary judgment with respect to Defendant Office of Management and

7

Budget's failure to grant a public interest fee waiver under to the Center for documents requested

8

under the Freedom of Information Act, 5 U.S.C. § 552.  This motion is based on this Notice and

9

Memorandum of Points and Authorities, the Declarations of Kassia Siegel and Justin Augustine

10

and attachments thereto, the pleadings and papers previously filed in this case, and all such other

11

supporting materials as may be filed in this matter hereafter.  This motion will be heard in

12

Courtroom 15 of the United States District Court for the Eastern District of California,

13

Sacramento Division, located at 450 Golden, San Francisco, California, on February 25, 2007, at

14

2:00 p.m., or as soon thereafter as the Court may schedule it.

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**I. INTRODUCTION**

2       This case presents a simple question:  Is an established non-profit environmental

3  organization entitled to a public interest fee waiver under the Freedom of Information Act

4  ("FOIA"), 5 U.S.C. § 552, when requesting previously undisclosed government documents related

5  to a significant public policy decision – here, the setting of vehicle fuel economy standards that

6  significantly implicate national policy on global warming.  FOIA expressly provides that

7  "[d]ocuments <u>shall</u> be furnished without charge" where the requester shows that "disclosure of the

8  information is in the public interest because it is likely to contribute significantly to the

9  understanding of the operations or activities of the government and is not primarily in the

10  commercial interest of the requester."  5 U.S.C. § 552(a)(4)(iii) (emphasis added).  Legislative

11  history and subsequent judicial interpretations make it abundantly clear that this fee waiver

12  provision is to be liberally construed.  Nevertheless, the Office of Management and Budget

13  ("OMB") denied a public interest fee waiver request by the Center for Biological Diversity

14  ("Center"), a non-profit environmental organization working to reduce greenhouse gas emissions,

15  for government records related to the development of fuel economy standards for SUVs, vans, and

16  other "light trucks," which together account for over half of all new passenger vehicles sold in the

17  U.S. each year.  After months of stalling, OMB ultimately concluded that the Center's request did

18  not satisfy FOIA's public interest fee waiver requirements, even though the Department of

19  Transportation ("DOT") granted an identical FOIA fee waiver for its documents related to the

20  same rulemaking.

21       Because the Center has fully satisfied the requirements for a public interest fee waiver and

22  because Defendant OMB has not provided any lawful basis for denying the fee waiver request, it

23  respectfully requests that the Court enter (1) a declaratory judgment finding that OMB violated

24  FOIA by denying the fee waiver request and (2) a permanent injunction ordering Defendant to

25  grant the fee waiver and timely produce the requested documents.

26

27

28

## II.  FACTUAL BACKGROUND

**A.    The National Fuel Economy Standards**

Transportation accounts for nearly one third of U.S. greenhouse gas emissions.  Declaration of Kassia Siegel ("Siegel Decl.") at ¶ 16.  The United States is the largest historical source of greenhouse gas pollution, and U.S. emissions are growing steadily.  Siegel Decl. at ¶ 15.  By far the largest and most troubling greenhouse gas pollutant is carbon dioxide, which is created by the burning of fossil fuels.  Because there is no effective pollution control equipment to limit carbon dioxide emissions, a motor vehicle's greenhouse gas output is directly correlated to its fuel economy; that is, an increase in fuel efficiency (miles per gallon) results automatically in a decrease in greenhouse gas emissions.

In 1975, Congress passed the Energy Policy and Conservation Act, which requires the National Highway Traffic Safety Administration ("NHTSA"), an agency within DOT, to set national fuel economy standards for passenger vehicles at the "maximum feasible" level.[1]  42 U.S.C. § 32902 (c).  It is hard to imagine a federal action that is more significant to the problem of global warming than one which dictates fuel consumption standards – and thereby directly affects greenhouse gas emissions – for millions of the nation's most polluting vehicles.  The most recent 2006 NHTSA rule affecting all SUVs and other light trucks established a new methodology for setting fuel standards and allowed continued increases in overall greenhouse gas emissions over the next several years.  Siegel Decl. at ¶ 18.  In developing the new rule, NHTSA relied on a cost-benefit analysis that excluded any consideration of the costs of global warming.  In other words, it failed to address the benefits of reduced greenhouse gas emissions from higher fuel economy standards.  Siegel Decl. at ¶ 19.  As the Ninth Circuit recently concluded, this improper economic analysis caused DOT to ignore the rule's substantial consequences for global warming, despite the

---

[1]  The statute articulates four factors that NHTSA must consider in deciding what constitutes the "maximum feasible" standard: technological feasibility, economic practicability, the effect of other standards on fuel economy, and the nation's need to conserve energy.  42 U.S.C. 32902 (f).

potentially catastrophic effects expected by scientists if greenhouse gas emissions continue to increase.  See Center for Biological Diversity v. National Highway Traffic Safety Administration, 508 F.3d 508, 531-35 (9th Cir. 2007).

OMB, an office within the White House which "ensures that agency reports, rules, testimony, and proposed legislation are consistent with . . . Administration policies,"[2] was directly involved with DOT in developing the new CAFE standards for light trucks.  See Answer at ¶ 7 (admitting that OMB consulted with DOT over the rulemaking).  Such OMB involvement in DOT rulemaking can and often does significantly impact the final regulation or standard, especially where, as here, cost-benefit analysis plays a pivotal role in the process.  A 2003 Government Accounting Office ("GAO") report entitled "OMB's Role in Reviews of Agency Draft Rules and the Transparency of Those Reviews" describes OMB as highly involved in agency rulemakings, especially with respect to agency cost-benefit considerations.[3]  The GAO focused its study on 85 health, safety, and environmental draft rules reviewed by OMB over a one-year period and found that OMB had "significantly affected" 25 of these draft rules "by suggesting changes that revised the scope, impact, or costs and benefits of the rules, returning the rules for reconsideration by the agency, or, in one case, requesting that the agency withdraw the rule from review."  Id. at 5.  The report called out DOT generally, and NHTSA specifically, as an agency whose decisions have been particularly influenced by OMB: "[A]lmost all of the returned rules were from the Department of Transportation (DOT), as was the rule withdrawn at [OMB's] request."  Id.  Further, "[i]n almost all of the 25 rules that were significantly affected, [OMB's] actions appeared

---

[2]  See OMB Website at http://www.whitehouse.gov/omb/organization/role.html.

[3]  See http://www.gao.gov/new.items/d03929.pdf.  Under Rule of Evidence 201, the Court may properly take judicial notice of this government document.  Lee v. City of Los Angeles, 250 F.3d 668, 688 (9th Cir. 2001) ("[u]under Fed.R.Evid. 201, a court may take judicial notice of "matters of public record"); Interstate Nat. Gas Co. v. Southern California Gas Co., 209 F.2d 380, 385 (9th Cir. 1954) ("We may take judicial notice of records and reports of administrative bodies."); Greeson v. Imperial Irr. Dist., 59 F.2d 529, 531 ("court is bound to take notice of . . . .public documents, reports of Commissions made to Congress, . . . ").

1   to have at least some effect on the potential costs and benefits associated with the rule or

2   prompted revisions to the agency's estimates of costs and benefits." Id. at 6. For instance, after

3   OMB returned a tire pressure rule to NHTSA because, in OMB's view, NHTSA had not selected

4   the best available regulatory alternative, "NHTSA inserted (at [OMB's] suggestion) additional

5   estimates of some costs and benefits of regulatory alternatives and added information about

6   benefits that might be realized with different regulatory alternatives." Id. at 10.[4] The GAO also

7   noted concerns with lack of transparency in the OMB review process and with OMB's failure to

8   disclose documents to the public. Id. at 52-58.

9       Understandably, the proposed CAFE rule caused a substantial amount of public controversy,

10  as demonstrated by the submission of over 45,000 comments from individuals, numerous state

11  governments, and environmental organizations on the draft regulation. Siegel Decl. at ¶ 19.

12  Many of the comments submitted to NHTSA advocated higher mileage standards that would

13  utilize the best available technology to minimize greenhouse gas emissions. Id.. The agency

14  dismissed these comments and published the final rule without adjustment. Id. at ¶ 20.

15  Subsequently, eleven states, the District of Columbia, and several national environmental

16  organizations joined the Center in challenging the regulations before the Ninth Circuit Court of

17  Appeals. Id. at ¶¶ 17, 22; CBD v. NHTSA, 508 F.3d at 508. In that lawsuit, NHTSA certified an

18  "administrative record" that consisted entirely of the electronic dockets created during the

19  rulemaking (Nos. 2005-22223 and 2006-24309). Id.. at ¶ 19. Those dockets, however, do not

20  include many of the NHTSA and OMB internal documents, notes, letters and other information

21  related to the fuel economy rulemaking. Id. at ¶ 19. After NHTSA refused to expand the

22  rulemaking dockets to include such internal agency documents, the Center pursued its right to

23  obtain the documents under FOIA. Declaration of Justin Augustine ("Augustine Decl.") at ¶ 4.

24

25

26

27  _____

28      [4] The revised rule was subsequently struck down by the Second Circuit Court of Appeals as contrary to the underlying tire safety legislation. Id.

**B.    The Center for Biological Diversity**

The Center is a non-profit, public interest environmental organization dedicated to the preservation of species diversity and the natural environment.  The Center made clear in its request for a fee waiver that it has a history of successfully requesting, analyzing and disseminating public documents under FOIA.  Augustine Decl., Exhs. A, F, I.  The Center, which has approximately 40,000 members, has an active website, receives regular press coverage, and regularly sends out three to four newsletters per month to its members and other supporters. Siegel Decl.at ¶ 4.

The scientific consensus that global warming will be potentially harmful to human and natural environments led the Center to prioritize public policy advocacy to reduce greenhouse gas emissions.  Siegel Decl. at ¶ 7, 8, 9.  The Center takes a multi-faceted approach to address global climate change, including state and national policy advocacy, petitioning, and litigation.  The Climate, Air and Energy Program at the Center is dedicated to reducing domestic polluting air emissions.  Staff members have established a substantial expertise in the science and regulatory politics of climate change.  Siegel Decl. at ¶ 7, 8, 9; Augustine Decl., Exh. A at 4.  The Center actively collects and disseminates information regarding U.S. governmental activities related to climate change.  Siegel Decl. at ¶ 7, 8, 9.  The Climate, Air and Energy Program at the Center intends to use the documents obtained from the FOIA request at issue in this case to further its public education and policy advocacy work for higher fuel economy standards.  Augustine Decl. at Exh. A at 5.

**C.    The FOIA Request**

On August 29, 2006, the Center submitted a FOIA request to DOT and OMB for documents associated with the fuel economy rulemaking that were not on the electronic docket available to the public.  The request also sought a public interest fee waiver, as allowed by 5 U.S.C. § 552(a)(4)(iii).  Augustine Decl. Exh. A at 1.  As explained in its request, the Center intends to use the requested documents to inform the public and lawmakers about the CAFE rulemaking and the

role of OMB in that process.  In particular, the Center seeks to acquire, analyze and publicize how and why the regulations were set at the level chosen by DOT and not at a higher level that would make use of the available fuel economy technologies.  Augustine Decl., Exh. A at 3.

After forty-three days, OMB responded by asking the Center to narrow the scope of its request.  Augustine Decl., Exh. B.  In response, the Center reiterated its request, explaining that it was crafted to seek only those documents related to the rulemaking that were not already in the public domain.  Id., Exh. D.  After another delay, this time of eighty days, OMB finally responded, denying the Center's fee waiver request.  Id., Exh H.  OMB argued that no fee waiver was appropriate because the agency "anticipated" that the documents requested would be "deliberative material, the disclosure of which would inhibit the frank and candid exchange of views necessary for effective government decisionmaking."  Id.  Accordingly, it refused to process the request unless the Center paid $6,171 in fees.  Id.  The Center immediately appealed the fee waiver denial, explaining that the fee waiver is mandated by the plain language of the statute and that the interpretation taken by OMB has no legal basis.  Id.., Exh. I.  In the meantime, DOT reversed its prior position on the Center's simultaneous request to that agency and granted a fee waiver for documents within its possession.  Id., Exh. G.  On March 14, 2007, the Center notified OMB by letter of its continued concern over the delayed response to the FOIA request.  Id., Exh. J.

Four and one-half months after the Center's administrative appeal, OMB finally responded and denied the appeal.  Augustine Decl., Exh. K.  In doing so, it offered four rationales.  First, it argued that because DOT has already made some documents public, additional OMB documents on this rulemaking will likely not be significant.  Second, it claimed that since many of the documents requested would likely be subject to privilege, the information that would be released would not be significant.  Third, OMB contended that because it is not the CAFE rulemaking agency and is, therefore, not charged with complying with statutes that empower that agency, those documents it might release are not likely to significantly contribute to the public interest. Finally, OMB argued  that any documents it might release would not clearly benefit the "public at

1  large" because the Center, in OMB's view, will only "passively" disseminate released

2  information.  Id.

3      OMB's denial letter stated that the Center could treat the response as a final decision on

4  appeal or could submit "additional information" before a final decision was made and demanded

5  an initial payment of $3,000 before proceeding with the request.  Augustine Decl., Exh. K.  In

6  response, the Center sent additional information to OMB, explaining the illegality of the fee

7  waiver decision.  Id., Exh. L.  OMB did not respond to this letter, nor has it returned phone calls

8  from the Center since that time.  Id. at ¶15.  Accordingly, the Center commenced this action.

9

10              **III.  LEGAL BACKGROUND**

11      The fundamental purpose of FOIA is to require that federal agencies provide complete

12  disclosure of administrative records and documents to any requester, unless clearly exempted by a

13  particular statutory provision.  Department of Air Force v. Rose, 425 U.S. 352 (1976).  The

14  dominant objective of the act is "disclosure, not secrecy."  Id. at 361.  The American public is

15  entitled to broad access to agency records for any reason, with the cost of this access kept to a

16  minimum.  Commercial requesters must pay agency search, reproduction, and review costs.  5

17  U.S.C. § 552(a)(4)(ii)(I).  Such fees are reduced for non-commercial requesters, such as

18  journalists and academics, id. § 552(a)(4)(A)(ii)(II)-(III), and are waived entirely for non-

19  commercial requesters if the public interest and understanding will be served by disclosure of the

20  documents.  Id. § 552(a)(4)(A)(iii).

21      Congress added the fee provisions of FOIA in 1974 "in an attempt to prevent government

22  agencies from using high fees to discourage certain types of requesters and requests."  Ettinger v.

23  Federal Bureau of Investigation, 596 F. Supp. 867, 872 (D. Mass. 1984) (citing S. Rep. No. 854,

24  93d Cong., 2d Sess. 11 (1974) concerning earlier 1974 amendment to add public interest fee

25  waiver provision).  In particular, the Senate Report on the fee provision amendments noted that

26  most agencies had been overly restrictive in granting fee waivers to indigents, journalists,

27  scholars, and non-profit public interest groups, thereby creating "'toll gate[s]' on the public access

28

road to information." Id. at 872-73.  Moreover, the public interest fee waiver provision of FOIA

was strengthened in 1986 specifically "to remove the roadblocks and technicalities which have

been used by various Federal agencies to deny waivers or reductions of fees," and the statute,

accordingly, "is to be liberally construed in favor of waivers for noncommercial requesters."

McClellan Ecological Seepage Situation v. Carlucci, 835 F.2d 1282, 1284 (9th Cir. 1987)

(quoting 132 Cong. Rec. S16496 (Oct. 15, 1986) and 132 Cong. Rec. S14298 (Sept. 30, 1986)).

See also Oregon Natural Desert Ass'n v. U.S. Dept. of Interior, 24 F. Supp. 2d 1088, 1094 (D.

Or. 1998); Pederson v. Resolution Trust Corp., 847 F. Supp. 851, 855-56 (D. Colo. 1994).

The agency must base its decision to grant or deny a fee waiver based on the simple criteria

provided in the law.  Specifically, FOIA provides that:

> Documents shall be furnished without any charge or reduced below the fees established [for
> commercial and non-commercial requesters] if disclosure of the information is in the public
> interest because it is likely to contribute significantly to public understanding of the
> operations and activities of the government and is not primarily in the commercial interest of
> the requester.

5 U.S.C. § 552(a)(4)(A)(iii).  Upon exhausting administrative review procedures, an aggrieved

requester may seek judicial review of an agency's denial or adverse determination.  5 U.S.C. §

552(a)(4)(B).

## IV.  STANDARD OF REVIEW

The Court's review of OMB's denial of the requested fee waiver is de novo and limited to

the facts and arguments in the record before the agency.  5 U.S.C. § 552(a)(4)(A)(vii); McClellan

Ecological Seepage Situation, 835 F.2d 1284; Friends of the Coast Fork v. U.S. Dep't of the

Interior, 110 F.3d 53, 55 (9th Cir. 1997).  This limitation applies as much to the reasons offered

by the agency for the denial as to the evidence in the record supporting the waiver.  Friends of the

Coast Fork, 110 F.3d at 55.  As the Ninth Circuit has held:  "[O]n judicial review, the agency

must stand on whatever reasons for denial it gave in the administrative proceeding.  If those

reasons are inadequate and if the requesters meet their burden, then a full fee waiver is in order."

Id.  Accordingly, in addition to explaining why a fee waiver was warranted in this case, this

1   memorandum briefly addresses the four arguments that OMB asserted in denying the Center's

2   appeal.

3                                    **V.  ARGUMENT**

4   **A.    The Center Is Entitled to a Full Fee Waiver Because the Requested Documents that
          Are Likely to Contribute Significantly to the Public Understanding Government
5          Operations.**

6       FOIA establishes a two-part test for a fee waiver:  "disclosure must be 'likely to contribute

7   significantly to public understanding of the operations or activities of the government,' and

8   disclosure must be 'not primarily in the commercial interest of the requester.'"  McClellan

9   Ecological Seepage, 835 F.2d at 1284.  The second prong of the test for fee waiver is not at issue

10  in this case.  The non-commercial nature of the Center and of the request was established in the

11  original request and never challenged by the agency; the Center is a non-profit organization that

12  seeks to reduce U.S. greenhouse gas emissions through policy advocacy, petitions to the

13  government and litigation. Siegel Decl. at ¶ 1, 2, 7, Augustine Decl., Exh. A.  Thus, the only issue

14  here is whether disclosure of the requested information is likely to contribute significantly to

15  public understanding of government operations and activities.  As explained below, the answer is

16  a resounding "yes."

17

18      The Ninth Circuit has held that where non-profit conservation organizations "identified why

19  they wanted the administrative record, what they intended to do with it, to whom they planned on

20  distributing it, and the... expertise of their membership" and "made it clear" to the agency "that

21  they meant to challenge publicly the scientific basis for the [agency decision]," plaintiffs had

22  made a prima facie showing that disclosure is "likely to contribute significantly to public

23  understanding."  Friends of the Coast Fork, 110 F.3d at 55.  In much the same way, the Center

24  here identified why it wants the requested documents, what it intends to do with them, how it

25  intends to distribute the results of it's analyses, and the expertise of the staff members associated

26  with this effort.  Augustine Decl., Exhs. A, F, I, L.  The fuel economy rulemaking is not well

27  understood by the public, and the bases for decisions are not transparent.  Political considerations

28

may override scientific ones, and without the ability to review the records in agency files, the Center and the larger public cannot evaluate the process and outcome. Access to OMB documents related to the rulemaking and an independent analysis of how the rule was developed will assist the public in learning how DOT and OMB treat climate science in their decisionmaking. The Center explained that it sought the documents for its expert staff to evaluate the government process for setting of the fuel economy standards and publicize that evaluation, and possibly the underlying documents received, to its membership and beyond. Id.. Nothing more is required.

The 1987 government FOIA fee waiver guidelines established by the Department of Justice[5] provide four factors that agencies must consider in deciding whether the request will significantly contribute to the public understanding of government operations and activities: (1) the request must concern the operations of government; (2) the materials requested must be valuable because they are not yet in the public domain; (3) materials must contribute to the understanding of the agency's work for a reasonably large audience; and (4) the requested documents must be significant. FOIA Update, Vol. VIII, No. 1, 1987. The Center's request meets all four requirements.

**1.      The Center's Request Concerns the Operations of Government.**

The first analytical factor is not at issue here. The Center seeks only documents related to the federal government's rulemaking on national fuel economy standards under the Energy Policy and Conservation Act. OMB did not deny that the subject of the requests concerns the operations or activities of the government in its letters to the Center, nor could it. Augustine Decl., Exh. B, H, K.

---

[5]  Available at http://www.usdoj.gov/oip/foia_updates/Vol_VIII_1/viii1page2.htm   The guidelines were updated in March 2007 and still follow the four factor analysis. The most recent update is available for download at http://www.usdoj.gov/oip/foia_guide07/fees_feewaivers.pdf. The four factors used here are discussed on pages 167-183 of that document.

1

2.    **The Requested Documents Are Not in the Public Domain.**

2

The second factor to be considered is whether or not the requested documents will be

3

valuable because they are not yet already in the public domain.  FOIA Update, Vol. VIII, No. 1,

4

1987.  The documents requested here clearly fit that request.  Still, OMB asserted in its fee-waiver

5

denial letters that because "the rulemaking agency has already made public a substantial amount

6

of information," the disclosure of the documents requested by the Center would not be likely to

7

contribute significantly to the public's understanding.  Augustine Decl. at Exh. H at 2.  That

8

assertion is incorrect.  The Center requested from OMB "all documents relating to the

9

development of the Final Rule setting average fuel economy standards for light trucks for model

10

years 2008-2011 (71 Fed. Reg. 17566-17679, "rulemaking") <u>that are not already posted on the</u>

11

<u>internet in Docket Nos. 2005-22223 and 2006-24309</u>."  Augustine Decl., Exh. A at 1 (emphasis

12

added).  Thus, the documents already available on DOT's electronic docket have absolutely no

13

bearing on the Center's request and, for that reason, no bearing on OMB's consideration of the fee

14

waiver.

15

16

Courts have routinely rejected the notion that quantity of responsive documents affects the

17

fee waiver decision.  For instance, in <u>Judicial Watch, Inc. v. Rossotti</u>, 326 F.3d 1309, 1314-15

18

(D.C. Cir. 2003), the court found that previous access to one of the requested documents was not a

19

bar to a fee waiver, when the request was for "considerably more" documents not already in the

20

public domain, such as correspondence, memoranda, and statements.  <u>See also</u> <u>Project on Military</u>

21

<u>Procurement v. Dep't of Navy</u>, 710 F. Supp. 362, 366 (D.D.C. 1989) (noting the significance that

22

a <u>single</u> document can have and holding that agencies may not consider the quantity of documents

23

to be released when making a determination on a fee waiver application); <u>Eudey v. CIA</u>, 478 F.

24

Supp. 1175, 1177 (D.D.C. 1979) (same).

25

26

3.    **The Requested Documents Will Contribute to the Understanding of OMB's Work for a Reasonably Large Audience.**

27

The Center has sufficiently established that disclosure of the requested information to the to

28

1    it will "contribute to the public understanding."  FOIA Update, Vol. VIII, No. 1, 1987.  The

2    Center can and would disseminate information on OMB's role in the rulemaking process, much of

3    which is not transparent to the public.  The Center has an expert staff that intends to analyze and

4    publicize the documents produced from the FOIA request on its website and in its newsletters, and

5    to seek coverage in newspapers and magazines of more general circulation.  Siegel Decl. at ¶¶ 2-

6    6; Augustine Decl., Exhs. A, F, I, L.  Thus, the Center has an established history of publicizing the

7    results of FOIA requests to its members and the public at large.  Siegel Decl. at ¶¶ 5- 6.

8         To satisfy the dissemination requirement, an applicant for a fee waiver must only show that

9    it is able to reach "a reasonabl[y] broad audience of persons interested in the subject"; it need not

10   demonstrate that it will "reach a broad cross-section of the public."  Carney, 19 F.3d at 814-15.

11   See also Cmty. Legal Servs., Inc. v. HUD, 405 F. Supp. 2d 553, 557 (E.D. Pa. 2005) (noting that

12   although the requester/fee waiver applicant's limited dissemination methods are unlikely to reach

13   a general audience, "there is a segment of the public interested in requester's work").  As one D.C.

14   district court noted, in "this Information Age, technology has made it possible for almost anyone

15   to fulfill [the dissemination] requirement."  D.C. Technical Assistance Org. v. HUD, 85 F. Supp.

16   2d 46, 49 (D.D.C. 2000).  See also VoteHemp, Inc. v. Drug Enforcement Administration, 237 F.

17   Supp. 2d 55, 62 (D.D.C. 2002) (finding fee waiver applicant's three-part dissemination plan –

18   using its Web site, issuing press releases, and communicating with legislators – sufficient to

19   satisfy the dissemination prong); Forest Guardians, 416 F.3d 1173, 1180 (10th Cir. 2005) (finding

20   Forest Guardian's publication of "an online newsletter, which is e-mailed to more than 2,500

21   people," and statement "that it intends to establish a [web site] with the information obtained"

22   sufficient to satisfy dissemination requirement).

23        The court's analysis on dissemination in Carney applies with equal force to this case:

24   We believe the [agency's] interpretation of the fee waiver provision is unreasonable.  As we
     understand the … position, no fee waiver would be granted to one unable to shoulder the
25   formidable burden of demonstrating that any records released actually will be disseminated
     to a large cross-section of the public.  This position is unrealistic.  Information need not
26   actually reach a broad cross-section of the public in order to benefit the public at large."

1  19 F.3d at 814-15.  There is undisputed evidence in the record that the Center staff includes

2  serious legal and scientific experts with a long record of successful publication.  Siegel Decl. at

3  ¶¶ 7-9; Augustine Decl., Exhs. A, F, I, L.  Moreover, there is no real question that there is

4  considerable public interest in proper response to climate change and management of the national

5  auto fleet fuel economy standards.[6]  The Center made it clear that it is has staff capable of

6  processing, analyzing and disseminating the information gained from the request.  Augustine

7  Decl., Exhs. A, J, L.  OMB's assertion that the Center will just be making the information

8  available, without analysis, is groundless and contrary to the information available to OMB at the

9  time of its denial of appeal.  The Center disseminating the requested information will illuminate

10  information that is currently hidden in obscure government offices.  Under the standard articulated

11  in Carney, the Center plainly qualifies for a public interest fee waiver.

12       The Center has the ability and intent to actively disseminate the information to a broad

13  audience of interested persons.  Like the requester in Forest Guardians, the Center sends out

14  regular electronic newsletters, entitled "Biodiversity Alerts," which contain information and

15  analysis on issues such as those at the heart of the FOIA request here.  Forest Guardians, 416 F.3d

16  at 1180.  These alerts are sent out approximately once a week to its members and online activists

17  – all of whom are interested in such information.  Siegel Decl. at ¶ 4.  Furthermore, like the

18  requester in VoteHemp, the Center plans to highlight the information gleaned from disclosure of

19  the requested documents in its newsletter and in other ways.  VoteHemp, 237 F. Supp. 2d 62

20  (holding that distribution of requested information through a website and newsletter is sufficient

21  to meet the dissemination prong); Siegel Decl. at ¶ 27.  In addition, the Center plans to use

22  knowledge gained from the requested information in comment letters and other communications

23

24

25

26       [6] Widespread media attention alone can suffice to show that disclosure of requested
27  information would contribute significantly to the public's understanding of an issue.  Pederson v.
   Resolution Trust Corp. 847 F. Supp. 851, 855 (D. Colo. 1994).  This is certainly the case here as
28  both the CAFE rulemaking and the subsequent litigation challenging it have received a
   tremendous amount of press.  Siegel Decl. at ¶¶ 23, 26.

with government officials.  The Center also plans to highlight what it learns from the requested

information on its website, which is accessed approximately 1.5 million times each month.  Siegel

Decl. at ¶ 5; Augustine Decl., Exhs. A, F, I, L.  Finally, the ongoing litigation over the CAFE

rulemaking, like many of the Center's past endeavors, have received wide media attention, in

print, on the television, and on the radio.  Siegel Decl. at ¶ 26 and Exhs. 1-4.  Thus, the Center's

efforts are not passive and easily satisfy the objectives of FOIA's fee waiver provisions.  See

Judicial Watch, Inc. v. Dep't. of Energy, 310 F. Supp. 2d at 292 (finding that requester's "litany of

means by which it [could] publicize information" without any specific representation that it

intended to do so in instant case satisfied dissemination requirement).

Moreover, the Center's history of active dissemination supports its current ability and intent

to disseminate information gleaned from OMB.  The Center has, on numerous occasions,

disseminated documents that were based entirely or largely from information gleaned from FOIA

requests.  For example, the Center learned from one FOIA request that the U.S. Fish and Wildlife

Service had improperly conducted its analysis in regard to an Endangered Species Act petition the

Center had submitted.  The Center published a press release on its website.  Siegel Decl. at ¶ 5

Similarly, the Center issued a press release, based largely on information obtained through various

FOIA requests, regarding a political appointee's improper actions while working at the

Department of Interior.  Siegel Dec.at ¶ 6.

The Center has more than met its burden of explaining "in detailed and non-conclusory term

– again all that FOIA requires – exactly how and to whom it will disseminate the information it

receives."  Rossotti, 326 F.3d at 1314.  See also VoteHemp, 237 F. Supp. 2d at 62; D.C. Technical

Assistance, 85 F. Supp. 2d at 49; Forest Guardians, 416 F.3d at 1180.

**4.    The Center's Request is Likely to "Contribute Significantly" to Public Understanding of OMB's Role in The Rule Making.**

The Center also has satisfied the fourth factor – whether the disclosure will likely contribute

significantly to public understanding of government operations or activities.  FOIA Update, Vol.

VIII, No. 1, 1987.  Interpretation of the fuel economy law has been a controversial area of national politics and has frequently been at the center of litigation.[7]  Siegel Decl. at ¶¶ 17-26.  The Center clearly stated that the goal of the request is to further understanding of the Administration's full rationale and basis for setting the standards at the level chosen.  Augustine Decl. at Exhs. A, F, I, L.  Without the information contained in the requested documents, the Center cannot effectively understand, share with members, or publicize the full basis for the fuel economy rule.  In other words, the requested disclosure not only will be highly informative, but is critical to the Center's success in illuminating government activities regarding climate change.

OMB should have considered whether the information requested is <u>itself</u> likely to contribute significantly to the public understanding of government operations, not, as suggested in OMB's June 12, 2007 letter to the Center, whether the information requested is likely to make a <u>comparably</u> valuable contribution to public understanding in light of relevant information already accessible in the public domain.  Augustine Decl., Exh. K; <u>Rossotti</u>, 326 F.3d at 1314-15.  The Center's request met the applicable standard.  The value of the information requested was amply supported in the Center's initial August 29, 2006 FOIA request, as well as in its January 29, 2007 and July 19, 2007 appeals.  Augustine Decl. at. Exhs. A, F, I, L.  While the Center cannot predict with precision what the requested documents will reveal about OMB's role in the fuel economy rulemaking, disclosure of the requested documents is likely to provide new information regarding the fuel economy standards and will significantly enhance the public's understanding of OMB's operations generally.  In addition, the requested documents will shed light on government compliance with applicable laws, including, but not limited to, the Administrative Procedure Act ("APA"), the Energy Policy and Conservation Act ("EPCA"), and the National Environmental Policy Act ("NEPA").  So long as it is likely that the entire body of information requested

---

[7]  On August 11, 2007, Nancy Pelosi said, "The American people – in every region of the country – overwhelmingly support stronger fuel efficiency standards."  Siegel Decl. at ¶ 24. After the Ninth Circuit ruled on the challenge to the fuel economy standards, Congress raised the average fuel economy standards to 35 miles per gallon by 2020.  Siegel Decl. at ¶ 25.

contains at least some information that would contribute significantly to the public's

understanding of federal governmental operations (according to an objective standard), a fee

waiver request should not be denied with respect to any of the information requested. See Project

on Military Procurement, 710 F. Supp. at 366; Eudey, 478 F. Supp. at 1177; 132 Cong. Rec.

S14298 (daily ed. Sept. 30, 1986) (statement of Sen. Leahy).

The requested documents will divulge "what the government is up to" because they will help

reveal whether OMB, as well as any other agency of the federal government, is conducting its

operations in accordance with applicable legal obligations. United States Dep't of Defense v.

Federal Labor Relations Auth., 510 U.S. 487, 495-496 (1994) (explaining that

"Official information that sheds light on an agency's performance of its statutory duties falls

squarely within [the] statutory purpose" of FOIA). As the Court of Appeal for the District of

Columbia held: "The public is always well served when it knows how government activities,

particularly matters touching on legal and ethical questions, have been conducted." Judicial

Watch., 326 F.3d at 1313-14. Because the requested documents will reveal information not

currently publicly available about the activities of OMB, and possibly other federal agencies, the

disclosure will contribute significantly to the public's understanding of government operations.

**B.    OMB Did Not Rebut the Center's Prima Facie Case for a Fee Waiver.**

Once the FOIA requester has made a sufficiently strong showing that it has satisfied the

public interest fee waiver standard, the burden shifts to the agency to justify a denial. Ettlinger v.

FBI, 596 F. Supp. 872. See also Friends of the Coast Fork, 110 F.3d at 55 (once requester makes

a prima facie case for waiver, burden shifts to government to rebut that case). In the FOIA request

itself, as well as the subsequent appeals, the Center made the prima facie case for a waiver. OMB

did not offer any legally sufficient rationale to rebut the Center's entitlement to a fee waiver.

The four arguments raised by OMB in its letters to the Center denying a fee waiver are

discussed below. OMB may chose not to advance all of these arguments in this court on its cross-

motion for summary judgment, but it cannot advance new arguments for the first time in this

litigation.  5 U.S.C. § 552(a)(4)(A)(vii); <u>McClellan Ecological Seepage</u>, 835 F.2d 1284; <u>Friends</u>
<u>of the Coast Fork</u>, 110 F.3d 55.

**1.      The Quantity of Documents to Be Released Has No Bearing on the Question of Fee Waiver.**

As discussed above, OMB's claim in its fee waiver denial that "the responsive documents
(or portions of documents) that OMB would most likely release will likely contain information
that is already in the publicly [sic] domain" because "it is information that is in the Transportation
Department's regulatory docket" is an empty claim, based on an obvious misreading of the
Center's FOIA request.  Augustine Dec., Exh. K at 3.  The request specifically asked for
disclosure of documents "that are <u>not</u> already posted on the internet in Docket Nos. 2005-22223
and 2006-24309" (DOT's regulatory docket).  Augustine Decl., Exh. A at 1 (emphasis added).
OMB has not claimed that it does not have any unreleased documents.  Instead, OMB made the
inappropriate subjective judgment that the requested documents would provide no public benefit.
Augustine Decl., Exh. K.

OMB's further unexplained assertion that some of the documents it would most likely
release will likely contain information "that is available in the press or other public documents"
also cannot justify its fee waiver denial.  Augustine Decl., Exh. K at 3.  Even if its claim were
true, OMB did not provide any explanation of where in the public domain the information
requested resides.  "The mere fact that material is in the public domain does not justify denying a
fee waiver; only material that has met a threshold level of public dissemination will not further
'public understanding' within the meaning of the fee waiver provisions." <u>Campbell v. Dep't of</u>
<u>Justice</u>, 164 F.3d 20, 36 (D.C. Cir. 1998); *see also* <u>Carney</u>, 19 F.3d at 815-16; <u>Schrecker v. Dep't</u>
<u>of Justice</u>, 970 F. Supp. 49, 50-51 (D.D.C. 1997); <u>Fitzgibbon v. Agency for Int'l Dev.</u>, 724 F.
Supp.1048, 1051 (D.D.C. 1989).  Furthermore, OMB's rationalization fails because it has not
"indicated how closely related the requested material [is] to material already existing in the public
domain." <u>Campbell</u>, 164 F.3d at 36.  These omissions "preclude deference to" OMB's

1  determination that much of the requested information may already be somewhere in the public

2  domain.  Id.

3      As legislative history and Department of Justice guidance on FOIA suggests, agencies like

4  OMB should not waste public resources making subjective judgments about the relative value of

5  documents to be released.  See, e.g., 132 Cong. Rec. S14298 (daily ed. Sept. 30, 1986) (statement

6  of Sen. Leahy) (emphasizing that agencies should administer the fee waiver provision in "an

7  objective manner and should not rely on their own, subjective view as to the value of the

8  information").  See also Department of Justice, Freedom of Information Act Guide, March 2007,

9  at 181-83.  The only foreseeable purpose of subjective valuation analysis by OMB would be to

10  prevent a waiver of fees for public interest groups like the Center, in direct contradiction to

11  Congress' intent to remove roadblocks to public access to government documents.  See McClellan

12  Ecological Seepage, 835 F. 2d at 1284.

13

14      2.      OMB's Assertion that It Would "Decline to Release" Most of the Documents
              Requested by the Center Is Irrelevant to the Question of Fee Waiver.

15

16      Despite OMB's assertion in its denial letters, Augustine Decl., Exhs. H, K, courts have

17  found that possible exemptions are not relevant to fee waiver analysis.  OMB has made no legal

18  argument, nor is there any, that its assertion of an exemption is at all relevant to the fee waiver

19  determination.  In Judicial Watch, Inc. v. United States Dep't. of Energy, the court held that "[a]

20  fee waiver request should be evaluated based on the face of the request and the reasons given by

21  the requester in support of the waiver,' not on the possibility that the records may ultimately be

22  determined to be exempt from disclosure."  310 F. Supp. 2d 271, 295 (D.D.C. 2004), (quoting

23  Carney v. United States Dep't of Justice, 19 F.3d 807, 815 (2d Cir. 1994)).  Thus, the fact that

24  OMB expects that it "would decline to release most of [the documents requested by the Center]"

25  is irrelevant.  Augustine Decl., Exh. L at 3.

26      Moreover, OMB's assertion flies squarely in the face of the Ninth Circuit's holding in

27  McClellan that the purpose of FOIA is to remove "roadblocks and technicalities" aimed at

28

1  preventing open access to government. 835 F.2d at 1284. FOIA's exemptions were never

2  intended to preclude fee waivers. If OMB can deny a fee waiver based on its supposition that

3  documents it might otherwise gather and produce are subject to exemption, the agency could

4  entirely evade the requirement that it identify individual documents subject to exemptions and

5  provide requesters with an appropriate explanation. Vaughn v. Rosen. 484 F.2d 820, 826-28

6  (D.D.C. 1973). OMB's assertion here is a thinly-veiled attempt to chill the FOIA process and

7  preclude access to public documents.

### 3. OMB's Fee Waiver Denial Rests on the Erroneous Contention that Only the Agency Charged with Implementing a Program Must Release Documents to the Public.

11  OMB claimed in its appeal denial that it has no legal responsibility for ensuring that the

12  "CAFE regulations are in compliance with such statutes as EPCA and NEPA," implying that only

13  DOT should release documents on the fuel economy rulemaking. Augustine Decl., Exh. K at 4.

14  OMB provides no legal rationale for why documents in their possession are not subject to FOIA

15  or why those documents would not illustrate government activity. Again, OMB does not claim

16  that it has no documents that fit the request. Instead, it claims that because it is not the

17  rulemaking agency, the release of documents in its possession is not required under FOIA.

18  It is enough, for the purpose of a waiver, that disclosure of the requested documents would

19  reveal to the public information about how OMB and, likely, DOT, have performed their duties

20  and, in general, what they are "up to." United States Dep't of Defense, 510 U.S. __ at 495-496

21  (1994) ("[FOIA's] basic policy of full agency disclosure … focuses on the citizens' right to be

22  informed about what their government is up to. Official information that sheds light on an

23  agency's performance of its statutory duties falls squarely within that statutory purpose"). Courts

24  have consistently held this type of information is important to the public, regardless of whether it

25  sheds light on any governmental improprieties. See Judicial Watch, 326 F.3d at 1313 ("the

26  question here is … whether disclosure is likely to contribute to public understanding of [agency]

27  operations—a goal that disclosure will promote regardless of what the documents reveal."). OMB

28

does not deny its involvement in the rulemaking nor its possession of relevant documents, and the recent GAO analysis of OMB participation in rulemaking shows that OMB has, in fact. been closely involved in NHTSA rulemaking efforts and has had a particularly strong role in government rulemaking where cost-benefit analysis is involved.   If OMB's assertion were correct, public interest requesters would have to prove the possession of useful documents before receiving a fee waiver.   FOIA has no such requirement.

    **4.**      **OMB Erred in its Creation of an Overly Broad "Public Dissemination" Criteria.**

OMB's final justification for the denial in its June 12, 2007 letter was that it is "not clear" that any information it would disclose to the Center "would contribute to the understanding <u>of the public at large</u>."  Augustine Decl. Exh. K at  4.  OMB seems to have completely ignored the Center's original request and the clear description, on pages 6-8 of the Center's January 29, 2007 administrative appeal, of its ability and intent to analyze, process, and disseminate to the public the information it would glean from disclosure of the requested documents.  Augustine Decl., Exhs. A, F, I, L.  As explained above, the Center's request is sufficient to be considered in the public interest.

**C.**    **Strong Policy Consideration Support a Full Fee Waiver in this Case.**

The legislative history of FOIA discussed in <u>Ettlinger</u>, <u>McClellan Ecological Seepage</u>, and other cases demonstrates that Congress intended independent academic researchers, journalists, and public interest watchdog groups to have ready and free access to government records in order to provide the kind of public disclosure so essential to the maintenance of a functioning democracy.  Fee waivers for public interest requests were created to guarantee such access.  In the 1986 amendments to FOIA, Congress ensured that when non-commercial requesters demonstrate a minimal showing of their legitimate intention to use the requested information in a way that contributes to public understanding of the operations of government agencies, no fee at all attaches to their request.

OMB's stilted interpretation of FOIA in this case turns the whole purpose of the statute and its fee waiver provision on their head. As a policy matter, a full fee waiver is warranted in this case. Plaintiff seeks documents from a White House office whose role in setting fuel economy standards is not well understood and over which there is little public or congressional oversight. OMB operates in the bureaucratic shadows, despite its large policy role in decisions that affect the entire national auto fleet, as well as present and future global climate. As the Supreme Court held in <u>Massachusetts v. EPA</u>, the effects of climate change "are serious and well recognized." 127 S. Ct. 1438, 1455. (U.S. 2007). The Court cited concern over "precipitate rise in sea levels by the end of the century … severe and irreversible changes to natural ecosystems … significant reduction in water storage in winter snowpack in mountainous regions with direct and important economic consequences … an increase in the spread of disease … [and] rising ocean temperatures may contribute to the ferocity of hurricanes." 127 S. Ct. 1455, 1456.

OMB's attempt to impose thousands of dollars in fees, using only the flimsiest of justifications, suggests that the agency is trying to avoid the very type of sunshine that Congress intended FOIA to encourage.

## VI.  CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court grant summary judgment against Defendants pursuant to Federal Rule of Civil Procedure 56 on the cause of action in this Complaint.

1   DATED: January 25, 2008                    Respectfully submitted,

2                                        ENVIRONMENTAL LAW CLINIC

3                                        Mills Legal Clinic at Stanford Law School

4

5                                        By: _/s/ Noah Long_____
                                              Noah Long, Certified Law Student
6                                             Deborah A. Sivas, Supervising Attorney

7                                        Counsel for CENTER FOR BIOLOGICAL DIVERSITY

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28